**UNITED STATES of America**

v.

**Russel J. CASO, Jr., Defendant.**

**Criminal No. 07–332 (RCL)**

United States District Court, District of Columbia.

Signed 01/10/2012

Filed 01/12/2012

Mary Ann Snow, U.S. Attorney's Office, Special Proceedings Section, Richard C. Pilger, U.S. Department of Justice, Public Integrity Section, Washington, DC, for United States of America.

Elizabeth G. Oyer, Office of the Federal Public Defender for the State of MD, Baltimore, MD, for Defendant.

## MEMORANDUM AND ORDER

ROYCE C. LAMBERTH, Chief Judge

Before the Court is defendant Russell J. Caso, Jr.'s Motion to Vacate [27] his sentence under 28 U.S.C. § 2255. Upon consideration of the motion, the government's opposition [36], the defendant's reply [40], the applicable law, and the entire record herein, the Court will deny the motion.

## I. BACKGROUND

The government filed an information [1] against the defendant on December 4, 2007 charging him with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 371, 1343, 1346. The defendant signed a plea agreement [6] on December 7, 2007, and Judge Henry Kennedy entered his plea that same day. According to the government's statement of offense [4], the defendant acted as a legislative assistant and then as Chief of Staff to an unnamed member of the United States House of Representatives, referred to as Representative A, from January 2004 to January 2007. During that time period, Representative A served on the governing counsel of an unnamed Firm, referred to as Firm A. Firm A, a non-profit consulting firm, worked on trade issues with Ameri-

can businesses operating in Russia. Firm A sought funding to develop a joint missile defense project, referred to as Proposal A, and to develop a program to reduce the proliferation of biological and chemical weapons from Russia to rogue nations, referred to as Proposal B. Firm A sought the assistance of Representative A and his staff in attempting to secure federal funding for those projects.

Firm A hired the defendant's wife on or about April 2005 to edit drafts of proposals A and B. The defendant's wife finished this work in May 2005, for which Firm A paid her $1,500. Firm A then made a series of payments to the defendant's wife over the course of the summer totaling $17,500, even though the defendant's wife did not do substantial additional work for Firm A. The defendant knew that the market value of the services performed by his wife for Firm A was not $19,000. Firm A and the defendant's wife discussed giving the defendant's wife a larger role in the firm, particularly if the firm secured federal funding for proposals A or B, but the funding did not accrue and the defendant's wife declined to continue working for the firm.

The defendant's position required him to submit annual Financial Disclosure Statements regarding various sources of income. Schedule I of each statement instructs respondents to list "the source, type, and amount of earned income from any source (other than the filer's current employment by the U.S. government) totaling $200 or more during the preceding calendar year. For a spouse, list the source and amount of any honoraria; list only the source for other spouse earned income exceeding $1,000." On the statement for calendar year 2005, the defendant intentionally omitted his wife's income from Firm A despite knowing that he was required to list this income. The defendant omitted the information because he knew it revealed a conflict of interest between his official position and his wife's finances. The defendant signed the statement on May 15, 2006, representing that the disclosures contained therein were true, complete, and correct. The defendant and the General Secretary of Firm A had an understanding that the payments to the defendant's wife should remain undisclosed.

During that same calendar year, Representative A forwarded proposals A and B to the State Department, and the defendant organized meetings in which he and Representative A made presentations soliciting funding for the proposals from Executive Branch agencies such as the State Department, the Department of Energy, and the National Security Council.

The government's proposed elements of the offense [8] detail the elements of the conspiracy charge, as well as the object of the conspiracy, honest services wire fraud. Specifically, the government represented that the defendant's failure "to disclose a conflict of interest that resulted in personal gain" constituted a "scheme to fraudulently deprive another of the intangible right of honest services" under 18 U.S.C. §§ 1343, 1346. The government further represented that the non-disclosure was material.

Judge Kennedy sentenced the defendant on July 30, 2009 to three (3) years of probation. The defendant did not take an appeal. The Supreme Court on June 24, 2010 decided *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). In that case, the defendant, former Enron president Jeffrey Skilling, challenged as unconstitutionally void for vagueness 18 U.S.C. § 1346, which defines "scheme or artifice to defraud" for the purposes of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, to include deprivations of "the intangible right of honest services." In response, the Court construed § 1346

to criminalize "*only* the bribe-and-kickback core" of honest services fraud, *i.e.*, deprivations of the intangible right of honest services that. involve an official taking a bribe or a kickback in return for official action. *Skilling*, 130 S.Ct. at 2931 (emphasis in original). Accordingly, post–*Skilling*, mere failures to disclose a conflict of interest in the absence of bribes or kickbacks do not constitute deprivations of "the intangible right of honest services," 18 U.S.C. § 1346, as that term relates to mail or wire fraud.

The defendant filed the instant motion on April 25, 2011, seeking to vacate the judgment against him pursuant to 28 U.S.C. § 2255.

## II. DISCUSSION

The defendant argues habeas relief is warranted because the conduct to which he admitted in the statement of the offense—which did not stipulate the defendant's receipt of a bribe or a kickback—does not constitute an offense under § 1346 following *Skilling*. Were it that simple. Federal courts' statutory authority to grant habeas relief implicates a tangled web of procedural requirements that can derail even the most meritorious of arguments. Fortunately, the government and the defendant largely agree as to where this case fits within that web.

The federal habeas statute, 28 U.S.C. § 2255, includes a one-year statute of limitations period. 28 U.S.C. § 2255(f). That limitations period normally begins to run on the date on which the judgment of conviction becomes final. *Id.* § 2255(f)(1). However, where a habeas petition is predicated on a right that "has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review," the statute of limitations begins to run on "the date on which the right asserted was initially recognized by the Supreme Court." *Id.* § 2255(f)(3). The

defendant argues, and the government concedes, that the *Skilling* decision applies retroactively, that the statute of limitations for a habeas petition by the defendant began to run on the date of that decision, and that the defendant's motion was thus timely filed within one year of that decision.

Under *Teague v. Lane*, Supreme Court decisions are generally not retroactive on collateral review. 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). An exception exists, however, if a new rule is substantive, *i.e.*, "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," *id.* at 311, 109 S.Ct. 1060 (quotations omitted), or "narrow[s] the scope of a criminal statute by interpreting its terms," *Schriro v. Summerlin*, 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). The *Teague* case arose out of a federal habeas petition brought by a *state* prisoner, and the rationale for that decision rested heavily on concerns of comity and federalism. *See generally United States v. Chang Hong*, 671 F.3d 1147 (10th Cir. 2011) (noting debate regarding whether *Teague* applies to federal prisoners). However, the D.C. Circuit has applied the *Teague* framework in assessing the retroactivity of Supreme Court decisions when determining whether to permit a second or successive federal habeas petition under § 2255(h). *In re Fashina*, 486 F.3d 1300, 1303 (D.C. Cir. 2007). Accordingly, *Teague* is most likely the appropriate framework for determining whether a decision is retroactive for the purposes of § 2255(f)(3).

The rule announced in the *Skilling* decision appears to be a typical substantive rule under the meaning of *Teague*—it "narrow[ed] the scope of a criminal statute by interpreting its terms," *Schriro* 542 U.S. at 351, 124 S.Ct. 2519. The Supreme Court has yet to officially opine that *Skilling* applies retroactively, and the statute of

limitations provision in § 2255(f)(3) only resets the limitations period when a right at issue "has been newly recognized by the Supreme Court *and made retroactively applicable* to cases on collateral review" (emphasis added). It is not clear whether the *Supreme Court* must make the retroactivity determination for the purposes of § 2255(f)(3), or whether a district court or circuit court of appeals may do so. *See Ryan v. United States*, 645 F.3d 913, 915 (7th Cir. 2011) (Easterbrook, J.) (discussing the interaction between *Skilling* and § 2255(f)(3)). But since the government has waived a statute of limitations defense in this case, and indeed has continually done so as a matter of practice in post-*Skilling* cases, the issue may be saved for another day. *See id.*

■ Although the government concedes that the defendant's motion is timely brought, the government argues that the defendant has waived his *Skilling* challenge through procedural default. Normally, a defendant must raise the basis of his habeas challenge during trial or on appeal in order to assert that claim on collateral review. *United States v. Frady*, 456 U.S. 152, 162, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The defendant never appealed his guilty plea on the basis that the conduct to which he pleaded guilty did not constitute an offense against the United States. In order to maintain his collateral attack, he must therefore show that he has cause for the default and that the default actually prejudiced him, or otherwise that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). The defendant does not assert that he has cause for his default. Rather, he alleges that he is actually innocent. The defendant and the government both agree that the defendant is actually innocent of the crime of honest services wire fraud as defined post–*Skilling*, since the admitted-to conduct did not include a bribe or kickback.

■ And thus finally does the core of the dispute emerge. When a defendant has pleaded guilty to a crime, and the Supreme Court later redefines that crime such that it does not include the conduct to which the defendant admitted, the defendant is no longer guilty of that specific crime. However, to establish "actual innocence" sufficient to excuse a procedural default in a § 2255 proceeding, the defendant must do more than point out this self-evident truth. Rather, the defendant must show his "factual innocence," *Bousley*, 523 U.S. at 623, 118 S.Ct. 1604, and, "where the Government has forgone more serious charges in the course of plea bargaining," the defendant's "showing of actual innocence must also extend to those charges," *id.* at 624, 118 S.Ct. 1604. The government represents that it forwent charging the defendant with making a false statement under 18 U.S.C. § 1001, and submits an affidavit of the lead prosecutor in the defendant's case to that extent. The government further requests an evidentiary hearing to prove this representation. In turn, the defendant argues that the required showing of innocence only applies to additional charges that the government presents in its information or indictment, and that since the information in his case only refers to the conspiracy to commit wire fraud, he need not rebut any additional charges.

Further, *Bousley* requires proof of innocence of "more serious" charges. 523 U.S. at 624, 118 S.Ct. 1604. The government does not contend that making a false statement is a more serious offense than conspiracy to commit honest services wire fraud, but submits that it is equally serious. The government and the defendant thus dispute whether a defendant must rebut a charge that is equally serious as, but not "more serious" than, the offense to which he pleaded guilty. Finally, the defen-

dant argues that making a false statement is a less serious offense than honest services wire fraud, and thus that in no event must he rebut that charge.

## A. Must The Defendant Rebut Charges Not Presented In The Information?

■ The government contends that the defendant's procedural default is not excused by actual innocence because the defendant remains guilty of the crime of making a false statement. The defendant asserts that, because the government did not charge the defendant with that offense in the information, he need not show actual innocence of that crime. The defendant in particular relies on the Supreme Court's decision in *Bousley.* In that case, Mr. Bousley pleaded guilty to "using" a firearm in violation of 18 U.S.C. § 924(c)(1). The Court later decided *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), restricting the definition of "use" for the purposes of that offense and thereby rendering the defendant's conduct non-culpable under the "use" prong of that statute. The Court noted that the defendant had procedurally defaulted on his claim that he did not "use" a firearm in violation of the statute, and thus that he would have to show actual innocence in order to proceed with his habeas claim. The Court stated:

> In this case, the Government maintains that petitioner must demonstrate that he is actually innocent of both "using" and "carrying" a firearm in violation of § 924(c)(1). But petitioner's indictment charged him only with "using" firearms in violation of § 924(c)(1). And there is no record evidence that the Government elected not to charge petitioner with "carrying" a firearm in exchange for his plea of guilty. Accordingly, petitioner need demonstrate no more than that he did not "use" a firearm as that term is defined in *Bailey.*

*Bousley,* 523 U.S. at 624, 118 S.Ct. 1604 (citations omitted). The defendant in this case seizes on the second sentence in that quoted language as an indication that the "actual innocence" inquiry only extends to charged offenses. In addition, the defendant cites a litany of cases in which courts only analyze actual innocence of charged offenses, and three cases in which courts expressly decline to extend the inquiry to uncharged offenses, *see United States v. Duarte–Rosas,* 221 Fed.Appx. 521 (9th Cir. 2007); *United States v. Lynch,* 807 F.Supp.2d 224 (E.D. Pa. 2011); *United States v. Panarella,* No. 2:00–cr–655, 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011).

■ Although the Court indeed noted in *Bousley* that the government did not charge the defendant with "carrying" a firearm in the indictment, it also stressed that "there is no record evidence" that the government dropped that charge in exchange for the defendant's plea. *Bousley,* 523 U.S. at 624, 118 S.Ct. 1604. It thus cannot be the case that the absence of a charge in an indictment or information is dispositive; if sufficient record evidence that the government considered a charge exists, the defendant must establish his innocence of that charge to cure a procedural default. *Cf. id.* at 635, 118 S.Ct. 1604 (Scalia, J., dissenting) (arguing that defendants would have to rebut charges made in indictments and, "if they could be identified, on charges *never made*") (emphasis in original). Oftentimes the existence or lack thereof of a charge in an indictment or information will be substantially probative, if not conclusive of the issue. But so long as the government can present evidence that it "has forgone more serious charges in the course of plea bargaining," *id.* at 634, 118 S.Ct. 1604, the defendant must establish his actual innocence of those charges.[1]

1. The cases to which the defendant cites do not compel a contrary conclusion. In *Duarte–*

■ Here, ample record evidence exists that the government considered prosecuting the defendant with a false statement charge but dropped that charge in exchange for the defendant's plea. The government submits an affidavit from the lead prosecutor on the defendant's case, attached as Exhibit 2 to its opposition, in which the prosecutor avers as follows:

[I]n exchange for Mr. Caso's guilty plea in this case, the Government forewent charging Mr. Caso with False Statement under 18 U.S.C. § 1001, although the Information clearly set forth Mr. Caso's conduct constituting the elements of a False Statement offense under 18 U.S.C. § 1001. In addition, the plea agreement Mr. Caso executed in this case, under the terms of which he pleaded guilty, specified that in consideration of Mr. Caso's plea to Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371, Mr. Caso would not be further prosecuted criminally for the conduct set forth in the Statement of Offense attached to the plea agreement or for any other conduct of which the Government was aware on the date Mr. Caso's guilty plea was entered.

This affidavit is eminently credible given the extent to which the statement of the offense and other related documents appear to establish a violation of § 1001. That offense requires proof of a knowing and willful materially false statement within the government's jurisdiction. *United States v. Stadd*, 636 F.3d 630 (D.C. Cir. 2011). The statement of offense stipulates that the defendant "intentionally failed to disclose that his wife received payments from Firm A" on the required Financial Disclosure Statement, "even though he knew that he was required to do so." This concession presents a *prima facie* case of false statement. The information filed against the defendant also alleges this same conduct. Furthermore, the government's proposed elements of the offense stipulate the materiality of the non-disclosure. Notably, the defendant does not contest his guilt of this charge; instead, he argues against its relevance in the absence of its formal institution. Combined with the affidavit from the lead prosecutor, these documents provide record evidence that the government considered but dropped a false statement prosecution in exchange for the defendant's plea, *see Bousley*, 523 U.S. at 624, 118 S.Ct. 1604.

## B. Must The Defendant Rebut Charges That Are Equally Serious As, But Not More Serious Than, The Charge To Which He Pleaded Guilty?

The defendant next argues that *Bousley* only requires him to establish his innocence of charges that the government could have brought and that are *more* serious than, not just equally serious as, the conspiracy charge. The logic behind this position is straightforward: *Bousley* discusses "cases where the Government has forgone *more* serious charges in the course of plea bargaining." *Id.* (emphasis added). But to hold a defendant accounta-

*Rosas,* the Ninth Circuit stated that "[r]equiring Duarte to show actual innocence of all possible crimes that the government might have been able to include in an indictment is more than the law requires." 221 Fed.Appx. at 522. Here, though, the defendant need not show actual innocence of all possible crimes with which the government could have charged him—instead, he must only show actual innocence if record evidence establishes that the government dropped those potential charges during plea negotiations. In *Panarella,* the district court noted that, unlike here, the "United States has made no argument that it deliberately elected not to charge Panarella" with the offense under dispute. 2011 WL 3273599 at *8. And in *Lynch,* the district court merely cited to *Duarte–Rosas* and *Panarella* without further analysis.

ble for equally serious offenses is not logically inconsistent with the Supreme Court's pronouncement. The Court clearly indicated in *Bousley* that a showing of actual innocence applies to more serious charges in the plea bargaining context, but did not expressly disavow that the requirement extends to equally serious charges. The language in *Bousley*, while significant, does not control the question.

Indeed, a circuit split has emerged over this issue. The Third Circuit has held that the required actual innocence showing only applies to more serious charges, while the Seventh Circuit has required this showing for equally serious charges.[2] In *United States v. Lloyd*, the Third Circuit explained in a footnote:

> The District Court may have been correct in characterizing the Supreme Court's reference to "more serious charges" as dictum. Nevertheless, it must be respected as a considered pronouncement to be followed in the federal system until and unless modified by the Supreme Court itself. The District Court's requirement that Lloyd demonstrate innocence of *any* dismissed charges was at odds with the Supreme Court's express formulation of the procedural conditions for relief.

188 F.3d 184, 189 n.11 (3rd Cir. 1999) (citation omitted). Meanwhile, Judge Posner in *Lewis v. T.C. Peterson* provided a lengthy analysis supporting the opposite conclusion:

> The idea behind [the actual innocence] rule is that had the government foreseen [the intervening case redefining the criminal statute] it would not have dropped the charge and so the petition-

er, who we know wanted to plead guilty, would probably have pleaded guilty to that charge instead, and if it was a more serious charge (or we add, no less serious a charge) he would probably have incurred a lawful punishment no less severe than the one imposed on him under the count to which he pleaded guilty.... [T]he government would not have dropped a good count in plea negotiations had it known that the remaining count was invalid, and if the dropped charge was indeed a good count, the defendant would not have escaped punishment had it not been dropped, punishment at least comparable to that imposed on the bad count.

. . .

The logic of the *Bousley* opinion does not require that the charge that was dropped in the plea negotiations be more serious than the charge to which the petitioner pleaded guilty. It is enough that it is as serious. For if it is as serious, the petitioner would have gained little or nothing had the government and he realized that the charge to which he pleaded guilty was unsound. Had they realized this they would have switched the plea to the sound charge, and as long as it was an equally serious charge... the punishment would probably have been the same.... [O]nly if [a count] charges a less serious crime is there a strong reason to believe that the defendant was punished more severely by virtue of having pleaded guilty to the count later learned to be invalid.

329 F.3d 934, 936–37 (7th Cir. 2003) (Posner, J.).

---

2. The defendant also argues that the Eighth Circuit only applies the requirement to more serious charges. Although it is true that the Eighth Circuit has only required defendants to show their innocence of more serious charges, *see, e.g., United States v. Johnson,* 260 F.3d 919 (8th Cir. 2001), it does not appear to have expressly dealt with the argument that a showing of innocence of an equally serious charge is necessary to excuse procedural default.

■ The Court finds the Seventh Circuit's analysis persuasive.[3] Little else need be said to add to Judge Posner's cogent explanation. All else being equal, defendants who plead guilty might elect to go to trial and risk conviction if charged with a less serious offense, but rationally would maintain their guilty plea if charged with an equally serious or more serious offense encompassing the same conduct. Accordingly, a defendant seeking to excuse a procedural default through a showing of actual innocence must prove innocence of both equally serious and more serious charges the government did not pursue as a result of plea negotiations.

### C. Are Conspiracy To Commit Honest Services Wire Fraud And False Statement Equally Serious Offenses?

Only if conspiracy to commit honest services wire fraud, 18 U.S.C. §§ 371, 1343, 1346, and making a false statement, 18 U.S.C. § 1001, are equally serious offenses must the defendant show his innocence of the latter charge. The defendant and the government differ as to how to determine whether two offenses are of comparable seriousness. The defendant urges that the issue be resolved through reference to the United States Sentencing Guidelines ranges for the offenses, while the government argues that the relevant inquiry is the maximum statutory penalties for each offense. The defendant cites to decisions of the Third and Eighth circuits that reference the guidelines in determining the relative seriousness of offenses for this purpose. *United States v. Halter*, 217 F.3d 551, 553 (8th Cir. 2000); *United States v. Lloyd*, 188 F.3d 184, 188 n.13 (3d Cir. 1999). The government responds by noting that these opinions predate the Supreme

Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), which held the guidelines to be advisory. The government thus posits that the appropriate method for measuring seriousness is through the congressionally authorized maximum sentences.

■ The Court agrees with the government. The *pre–Booker* decisions cited by the defendant rely on the then-mandatory nature of the guidelines. For example, the Eighth Circuit in *Halter* stressed that while "Congress sets the maximum penalty for the violation of criminal statutes, it has also adopted the Guidelines as the proper sentencing procedure to be followed by all federal courts in determining actual punishment for federal crimes." *Halter*, 217 F.3d at 553. That is no longer necessarily the case. District courts today have the authority to depart upward or downward from the applicable guideline range, constrained both through appellate review for reasonableness, *see, e.g., United States v. Lawrence*, 662 F.3d 551 (D.C. Cir. 2011), and through statutory maximum sentences. The guidelines no longer absolutely constrain a sentencing court's authority, but the maximum sentences found in criminal statutes continue to do so. Those Congressionally set penalties thus provide the appropriate lens for determining the relative seriousness of offenses.

■ Notably, the U.S. Sentencing Commission does not limit its consideration in determining guideline ranges to the seriousness of offenses; instead, the Commission analyzes a number of other factors, such as the deterrent effect a particular sentence may have on the commission of the offense and the current inci-

---

**3.** Similar to the Third Circuit, the D.C. Circuit has noted that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authorita-

tive." *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997). The Court is satisfied, however, that this case presents an exception to this "general[ ]" rule.

dence of the offense in the country, *see* 28 U.S.C. § 994(c). The Commission must also consider the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2) in setting the guidelines, *see* 28 U.S.C. §§ 994(f), 991(b)(1)(A), and the purposes of sentencing of course include but are not limited to retribution. Given the variety of considerations involved in the Sentencing Commission's determination of the guideline ranges, it seems counterintuitive to conclude that those guidelines are purely reflective of the seriousness of an offense, and thus that an offense with a higher guidelines range is by definition a "more serious" offense. Rather, the correct measure of an offense's seriousness is the severity of sentence a district court is empowered by Congress to impart. If Congress has determined that two offenses carry equivalent maximum sentences, Congress has in essence determined that the offenses may warrant equivalent levels of retribution. In such an instance, the offenses are of equivalent seriousness.

 Here, the defendant's charged offense, conspiracy to commit honest services wire fraud, carries a maximum statutory penalty of five years imprisonment. 18 U.S.C. § 371. So too does the other offense with which the government considered charging the defendant, making a false statement. 18 U.S.C. § 1001. The two offenses are equally serious.

## III. CONCLUSION AND ORDER

In order to excuse his procedural default of a *Skilling* claim, the defendant must prove his innocence of making a false statement. However, the statement of the offense, the information, and the proposed elements of the offense conclusively determine his guilt of that crime, which the defendant does not contest. An evidentiary hearing is thus unnecessary, and the defendant may not advance his underlying claim on collateral review. It is therefore hereby

**ORDERED** that the defendant's motion is **DENIED**.

**SO ORDERED** this 10th day of January 2012.